In re Beverly A. JOHNSON, Debtor.

No. 00–13479 K.

United States Bankruptcy Court, W.D. New York.

Oct. 25, 2000.

Peter Grubea, Buffalo, NY, for debtor.

Thomas J. Gaffney, Buffalo, NY, trustee.

MICHAEL J. KAPLAN, Bankruptcy Judge.

Following closely on the heels of this Court's decision in *In re Lowe*, 252 B.R. 614 (Bankr.W.D.N.Y.2000), holding a particular profit sharing fund non-exempt, comes another exemption question that appears to be, like *Lowe*, a matter of first impression. The Court is asked whether funds that many thousands of people have in trust under the "Deferred Compensation Plan for Employees of the State of New York and Other Participating Public Jurisdictions" are exempt property in a bankruptcy case of one such person. Debtor's counsel believes that 20% of all

municipal, county and state employees in this state are enrolled in plans identical to this "Deferred Compensation Plan." And this Court is aware that such public servants are not immune from some of the woes that lead debtors to our doors.

The analysis of New York State Exemption Law as set forth in *Lowe* is here reaffirmed. The Court sustains the Chapter 7 Trustee's objection to the claim of exemptions. The $4000 that this Debtor has in her trust account under this plan is not exempt and the Trustee has greater rights to those funds than the Debtor has, as discussed herein.

## THE "DEFERRED COMPENSATION PLAN"[1] AND ITS STATUTORY BASES

The statement of "Purpose" that begins the plan recites: "The purpose of the Plan is to encourage Employees to make

---

1. The Plan is 43 pages long. Its various sections may be summarized as follows, for purposes of this Decision:

COURT–PREPARED SUMMARY OF DEFERRED COMPENSATION PLAN FOR EMPLOYEES OF THE STATE OF NEW YORK AND OTHER PARTICIPATING PUBLIC JURISDICTIONS

PURPOSE

Section 1. DEFINITIONS

The following are summaries of some key definitions.

*Administrative Service Agency* means an Administrative Service Agency as defined in the Regulations and selected by the Board to provide services in respect of the Plan.

*Board* means the Deferred Compensation Board of the State of New York established by Section 5 of the State Finance Law.

*Financial Organization* means a Financial Organization as defined in the Regulations and selected by the Board to provide services in respect of the Plan.

*Participant* means an Employee or former Employee who is enrolled in the Plan.

*Participation Agreement* means a written agreement between an Employee and the Employer, pursuant to which the Employee elects to reduce their Compensation and to have the Amount Deferred contributed to the Plan on his or her behalf in accordance with the terms of the Plan.

*Regulations* means the rules and regulations promulgated by the Board pursuant to Section 5 of the State Finance Law.

*Trust Agreement* means an agreement entered into in respect of the Plan between the Board and Trustee(s) pursuant to which all Amounts Deferred, all property and rights purchased with such Amounts Deferred and all income attributable to such Amounts Deferred, property and rights are held in trust for the exclusive benefit of Participants and their Beneficiaries and Alternate Payees.

Section 2. PARTICIPATION

Participation in the Plan is on a voluntary basis and automatically ceases upon payment of the entire value of the Plan Benefit or upon the death of a Participant prior to repayment.

This section outlines the procedure for enrollment in the Plan.

Section 3 AMOUNTS DEFERRED

The provision allows a Participant under the Plan to authorize regular payroll deductions, increase or decrease their rate of deferral, discontinue, or temporarily suspend the deferral. The amounts deferred must fall within the limitations of this provision and § 457 of the Code. The provision also requires the Employer and Trustee to withhold all required taxes with respect to any amounts deferred or distributed under the Plan.

Section 4. INVESTMENT OF AMOUNTS DEFERRED

The amount deferred shall be paid by the Employer to the Trustee. The Trustee shall then invest in accordance with the directions of the Participant. The Board appoints a Trustee or Financial Organization to service the Plan. The Board has the sole discretion to replace any Financial Organization or Investment Fund and to incur expenses on behalf of the plan and allocate such fees and expenses among accounts in connection with such replacement or addition.

The Participant may specify the percentage of the amount of their deferred compensation that is to be allocated to each fund and may change their investment directions in accordance with the Plan. No direction for transfer may be in violation of the terms of any agreements between the Board, Trustee or Financial Organization or any applicable law.

Each Participant is responsible for the investment and allocation of their Plan Benefit and assumes any risk in the event of a decrease in value. The Board, any Employer, any Trustee or the Administrative Service Agency are not empowered to give advice to Participants regarding allocation or investment. Further, a Participant should not consider the availability of particular investment vehicles to be a recommendation for investment.

The value of each Participant's account will be set aside in a trust fund as set up in the Trust Agreement for the exclusive benefit of the Participant, their Beneficiaries and Alternative Payees.

and continue careers with the State by providing eligible employees with a convenient way to save on a regular and long-term basis and thereby provide for their retirement as set forth herein. Other Public Employers in the State can elect to provide their eligible Employees with such a savings mechanism by adopting the Plan.... The Plan and the Trust Agreement are intended to satisfy the requirements for an 'eligible deferred compensation plan' under Section 457 of the [Internal Revenue] Code."

26 U.S.C. § 457 permits state and local governments and tax exempt organizations

The provision sets forth the control and treatment of funds in the event the Participant dies or the funds (or portion thereof) are subject to a Certified Domestic Relations Order.

Section 5. ACCOUNTS AND RECORDS OF THE PLAN

The Administrative Service Agency is selected by the Board to provide services to the Plan. The provision provides the methodology for account management with respect to each Participant.

Section 6. WITHDRAWALS FOR UNFORESEEABLE EMERGENCIES; WITHDRAWALS OF SMALL AMOUNTS.

This section allows the Administrative Service Agency, in its sole discretion, to permit payment upon a showing of unforeseeable emergency by the Participant. The withdrawal is limited to the lesser of the amount necessary to meet the financial need or the amount available from the Participant's account as of the last valuation date.

This provision defines unforeseeable emergency in accordance with § 457 of the Code, as a severe financial hardship resulting from sudden and unexpected illness or accident of the Participant or of a dependent, as defined in § 152(a) of the Code, of the Participant, loss of the Participant's property due to casualty, or other similar extraordinary and unforeseeable circumstances arising as a result of events beyond the control of the Participant. Section 6 also provides that an amount will not be considered reasonably necessary where the financial need could be met through reimbursement or compensation from insurance, liquidation of a Participant's assets, to the extent the liquidation would not cause severe hardship or by cessation of deferrals under the Plan.

The provision also provides for a lump sum payment at the request of the Participant if the amount payable does not exceed $5000 and there has been no amount deferred by the Participant during the two-year period ending on the date of distribution and no prior distribution has been made under this section.

Section 7. DISTRIBUTIONS

Except as provided in Section 6, Participants may not receive distribution of their Plan Benefit at any time prior to the earlier of the Participant's separation of service with the employer or the plan year in which such Participant attains the age of 70½. This section provides for the manner and time in which such distributions are made.

Section 8. DESIGNATION OF BENEFICIARIES.

This section provides the methodology for designating beneficiaries under the Plan.

Section 9. ADMINISTRATION

The Board is responsible for the operation and administration of the Plan. The provision sets forth the general duty and powers of the Board. The determinations of the Board shall be final, conclusive and binding on all parties. The powers include, but are not limited to, the right to request information, make and enforce rules and regulations, interpretation on the Plan, questions concerning eligibility, and determination of amounts payable under the provisions of the Plan. This section provides the procedure for making a claim to rights or benefits under the Plan including a request for hardship withdrawal under Section 6.

Section 10. WITHDRAWALS OF PARTICIPATING EMPLOYERS

This section provides the procedure by which a Participating Employer may terminate participation in the Plan. Once termination occurs the Employer will not permit further deferrals, but the rights of Participants under the Plan will remain unaffected.

Section 11. AMENDMENT OR TERMINATION

This provision outlines the manner in which the Board may amend, suspend or terminate the Plan, any deferrals thereunder, the Trust Agreement and any Investment Fund, in whole or in part.

Section 12. GENERAL LIMITATIONS AND PROVISIONS

Section 12 provides a broad overview of the limitations and provisions of the Plan. The Plan shall not be construed to give the employee greater rights for continued employment nor is it a limitation on the employer's right to terminate an employee. The section deals with the events of infirmity, death of a Participant or payment of benefits with respect to a Certified Domestic Relations Order. The provision limits the liability of the Board, the Employer, the Trustee and their employees except as otherwise required by applicable law.

This section also contains an anti-alienation paragraph within this provision.

to establish and maintain a plan under which their employees may defer limited amounts of their compensation and not have to pay income taxes thereon until they receive the compensation so deferred. That will happen, typically, when the participant attains age 70½, or when she separates from service with the employer, or "when the participant is faced with an unforeseeable emergency (determined in the manner prescribed by the Secretary [of the Treasury] in the regulations)...."[2]

2. 26 U.S.C. § 457(d). The complete statute reads:

**§ 457. Deferred compensation plans of State and local governments and tax exempt organizations**

(a) **Year of inclusion in gross income.**—In the case of a participant in an eligible deferred compensation plan, any amount of compensation deferred under the plan, and any income attributable to the amounts so deferred, shall be includible in gross income only for the taxable year in which such compensation or other income is paid or otherwise made available to the participant or other beneficiary.

(b) **Eligible deferred compensation plan defined.**—For purposes of this section, the term "eligible deferred compensation plan" means a plan established and maintained by an eligible employer—

(1) in which only individuals who perform service for the employer may be participants,

(2) which provides that (except as provided in paragraph (3)) the maximum amount which may be deferred under the plan for the taxable year shall not exceed the lesser of—

(A) $7,500, or

(B) 33⅓ percent of the participant's includible compensation,

(3) which may provide that, for 1 or more of the participant's last 3 taxable years ending before he attains normal retirement age under the plan, the ceiling set forth in paragraph (2) shall be the lesser of—

(A) $15,000, or

(B) the sum of—

(i) the plan ceiling established for purposes of paragraph (2) for the taxable year (determined without regard to this paragraph), plus

(ii) so much of the plan ceiling established for purposes of paragraph (2) for taxable years before the taxable year as has not previously been used under paragraph (2) or this paragraph

(4) which provides that compensation will be deferred for any calendar month only if an agreement providing for such deferral has been entered into before the beginning of such month,

(5) which meets the distribution requirements of subsection (d), and

(6) except as provided in subsection (g), which provides that—

(A) all amounts of compensation deferred under the plan,

(B) all property and rights purchased with such amounts, and

(C) all income attributable to such amounts, property, or rights,

shall remain (until made available to the participant or other beneficiary) solely the property and rights of the employer (without being restricted to the provision of benefits under the plan), subject only to the claims of the employer's general creditors.

A plan which is established and maintained by an employer which is described in subsection (e)(1)(A) and which is administered in a manner which is inconsistent with the requirements of any of the preceding paragraphs shall be treated as not meeting the requirements of such paragraph as of the 1st plan year beginning more than 180 days after the date of notification by the Secretary of the inconsistency unless the employer corrects the inconsistency before the 1st day of such plan year.

(c) **Individuals who are participants in more than 1 plan.**—

(1) **In general.**—The maximum amount of the compensation of any one individual which may be deferred under subsection (a) during any taxable year shall not exceed $7,500 (as modified by any adjustment provided under subsection (b)(3)).

(2) **Coordination with certain other deferrals.**—In applying paragraph (1) of this subsection—

(A) any amount excluded from gross income under section 403(b) for the taxable year, and

(B) any amount—

(i) excluded from gross income under section 402(e)(3) or section 402(h)(1)(B) or (k) for the taxable year, or

(ii) with respect to which a deduction in allowable by reason of a contribution to an organization described in section 501(c)(18) for the taxable year,

shall be treated as an amount deferred under subsection (a). In applying section 402(g)(8)(A)(iii) or 403(b)(2)(A)(ii), an amount deferred under subsection (a) for any year of service shall be taken into account as if described in section 402(g)(3)(C) or 403(b)(2)(A)(ii), respectively. Subpara-

graph (B) shall not apply in the case of a participant in a rural cooperative plan ( as defined in section 401(k)(7)).

**(d) Distribution requirements.—**

**(1) In general.—**For purposes of subsection (b)(5), a plan meets the distribution requirements of this subsection if—

(A) under the plan amounts will not be made available to participants or beneficiaries earlier than—

(i) the calendar year in which the participant attains age 70½,

(ii) when the participant is separated from service with the employer, or

(iii) when the participant is faced with an unforeseeable emergency (determined in the manner prescribed by the Secretary in regulations), and

(B) the plan meets the minimum distribution requirements of paragraph (2).

**(2) Minimum distribution requirements.—**A plan meets the minimum distribution requirements of this paragraph if such plan meets the requirements of subparagraphs (A), (B), and (C):

**(A) Application of section 401(a)(9).—**A plan meets the requirements of this subparagraph if the plan meets the requirements of section 401(a)(9).

**(B) Additional distribution requirements.—**A plan meets the requirements of this subparagraph if—

(i) in the case of a distribution beginning before the death of the participant, such distribution will be made in a form under which—

(I) the amounts payable with respect to the participant will be paid at times specified by the Secretary which are not later than the time determined under section 401(a)(9)(G) (relating to incidental death benefits), and

(II) any amount not distributed to the participant during his life will be distributed after the death of the participant at least as rapidly as under the method of distributions being used under subclause (I) as of the date of his death, or

(ii) in the case of a distribution which does not begin before the death of the participant, the entire amount payable with respect to the participant will be paid during a period not to exceed 15 years (or the life expectancy of the surviving spouse if such spouse is the beneficiary).

**(C) Nonincreasing benefits.—**A plan meets the requirements of this sub-paragraph if any distribution payable over a period of more than 1 year can only be made in substantially nonincreasing amounts (paid not less frequently than annually).

**(e) Other definitions and special rules.—**For purposes of this section—

**(1) Eligible employer.—**The term "eligible employer" means—

(A) a State, political subdivision of a State, and any agency or instrumentality of a State or political subdivision of a State, and

(B) any other organization (other than a governmental unit) exempt from tax under this subtitle.

**(2) Performance of service.—**The performance of service includes performance of service as an independent contractor and the person (or governmental unit) for whom such services are performed shall be treated as the employer.

**(3) Participant.—**The term "participant" means an individual who is eligible to defer compensation under the plan.

**(4) Beneficiary.—**The term "beneficiary" means a beneficiary of the participant, his estate, or any other person whose interest in the plan is derived from the participant.

**(5) Includible compensation.—**The term "includible compensation" means compensation for service performed for the employer which (taking into account the provisions of this section and other provisions of this chapter) is currently includible in gross income.

**(6) Compensation taken into account at present value.—**Compensation shall be taken into account at its present value.

**(7) Community property laws.—**The amount of includible compensation shall be determined without regard to any community property laws.

**(8) Income attributable.—**Gains from the disposition of property shall be treated as income attributable to such property.

**(9) Benefits not treated as made available by reason of certain elections, etc.—**

**(A) Total amount payable is dollar limit or less.—**The total amount payable to a participant under the plan shall not be treated as made available merely because the participant may elect to receive such amount (or the plan may distribute such amount without the participant's consent) if—

(i) such amount does not exceed the dollar limit under section 411(a)(11)(A), and

(ii) such amount may be distributed only if—

(I) no amount has been deferred under the plan with respect to such participant during the 2–year period ending on the date of the distribution, and

(II) there has been no prior distribution under the plan to such participant to which this subparagraph applied.

A plan shall not be treated as failing to meet the distribution requirements of

subsection (d) by reason of distribution to which this subparagraph applies.

**(B) Election to defer commencement of distributions.**—The total amount payable to a participant under the plan shall not be treated as made available merely because the participant may elect to defer commencement of distributions under the plan if—

(i) such election is made after amounts may be available under the plan in accordance with subsection (d)(1)(A) and before commencement of such distributions, and

(ii) the participant may make only 1 such election.

**(10) Transfers between plans.**—A participant shall not be required to include in gross income any portion of the entire amount payable to such participant solely by reason of the transfer of such portion from 1 eligible deferred compensation plan to another eligible deferred compensation plan.

**(11) Certain plans excluded.**—

**(A) In general.**—The following plans shall be treated as not providing for the deferral of compensation:

(i) Any bona fide vacation leave, sick leave, compensatory time, severance pay, disability pay, or death benefit plan.

(ii) Any plan paying solely length of service awards to bona fide volunteers (or their beneficiaries) on account of qualified services performed by such volunteers.

**(B) Special rules applicable to length of service award plans.**—

**(i) Bona fide volunteer.**—An individual shall be treated as a bona fide volunteer for purposes of subparagraph (A)(ii) if the only compensation received by such individual for performing qualified services is in the form of—

**(I)** reimbursement for (or a reasonable allowance for) reasonable expenses incurred in the performance of such services, or

**(II)** reasonable benefits (including length of services awards), and nominal fees for such services, customarily paid by eligible employers in connection with the performance of such services by volunteers.

**(ii) Limitation on accruals.**—A plan shall not be treated as described in subparagraph (A)(ii) if the aggregate amount of length of service awards accruing with respect to any year of service for any bona fide volunteer exceeds $3,000.

**(C) Qualified services.**—For purposes of this paragraph, the term "qualified services" means fire fighting and prevention services, emergency medical services, and ambulance services.

**(12) Exception for nonelective deferred compensation of nonemployees.**—

**(A) In general.**—This section shall not apply to nonelective deferred compensation attributable to services not performed as an employee.

**(B) Nonelective deferred compensation.**—For purposes of subparagraph (A), deferred compensation shall be treated as nonelective only if all individuals (other than those who have not satisfied any applicable initial service requirement) with the same relationship to the payor are covered under the same plan with no individual variations or options under the plan.

**(13) Special rule for churches.**—The term "eligible employer" shall not include a church (as defined in section 3121(w)(3)(A)) or qualified church-controlled organization (as defined in section 3121(w)(3)(B)).

**(14) Treatment of qualified governmental excess benefit arrangements.**—Subsections (b)(2) and (c)(1) shall not apply to any qualified governmental excess benefit arrangement (as defined in section 415(m)(3)), and benefits provided under such an arrangement shall not be taken into account in determining whether any other plan is an eligible deferred compensation plan.

**(15) Cost-of-living adjustment of maximum deferral amount.**—The Secretary shall adjust the $7,500 amount specified in subsections (b)(2) and (c)(1) at the same time and in the same manner as under section 415(d), except that the base period shall be the calendar quarter ending September 30, 1994, and any increase under this paragraph which is not a multiple of $500 shall be rounded to the next lowest multiple of $500.

**(f) Tax treatment of participants where plan or arrangement of employer is not eligible.**—

**(1) In general.**—In the case of a plan of an eligible employer providing for a deferral of compensation, if such plan is not an eligible deferred compensation plan, then—

(A) the compensation shall be included in the gross income of the participant or beneficiary for the 1st taxable year in which there is no substantial risk of forfeiture of the right to such compensation, and

(B) the tax treatment of any amount made available under the plan to a participant or beneficiary shall be determined under section 72 (relating to annuities, etc.)

**(2) Exceptions.**—Paragraph (1) shall not apply to—

(A) a plan described in section 401(a) which includes a trust exempt from tax under section 501(a),

(B) an annuity plan or contract described in section 403,

(C) that portion of any plan which consists of a transfer of property described in section 83,

(D) that portion of any plan which consists of a trust to which section 402(b) applies, and

Despite its complexity, the statute has but one simple purpose: to prescribe the year in which the participant must declare the deferred compensation as part of her gross income for federal income tax purposes.

The statute requires that "A plan maintained by an eligible employer . . . shall not be treated as an eligible deferred compensation plan unless all assets and income of the plan . . . are held in trust for the exclusive benefit of participants and their beneficiaries."[3]

The plan itself expressly states that "Participation . . . by Employees shall be wholly voluntary." (§ 2.2 of the Plan.)

And, "A Participant may elect to defer Compensation under the Plan by authorizing, on his or her Participation Agreement, regular payroll deductions that do not in the aggregate exceed the [statutory] limitations . . . [and a] Participant may discontinue, or temporarily suspend, his or her deferral of Compensation as of any Enrollment Date by giving notice thereof . . . at least twenty . . . days prior to such date." (§ 3.1 of the Plan.)

The monies in the Debtor's account derived from no source other than monies she earned as an employee, and her share of the earnings of the trust.

### THE DEBTOR'S ARGUMENTS

The Debtor argues that this plan is a spendthrift trust exempt under New York's Civil Practice Law and Rules ("CPLR") § 5205(c) or under 11 U.S.C. § 541(c); that it is a retirement system exempt under the N.Y. Retirement and Social Security Law § 110 or N.Y. Insurance Law § 4607; that the Debtor has no present rights to the funds and that the Trustee, therefore, could have none; and that this is a "qualified" retirement plan, exempt under ERISA. The Court will address the arguments in a different order, for clarity's sake.

### THIS IS NOT ERISA–QUALIFIED

■ The Trustee has produced a letter from the Plan Administrator expressly stating it is not an ERISA-qualified plan; rather it is a qualified "deferred compensation" plan, as discussed more fully hereinafter.

The Debtor's argument in this regard is rejected.

---

(E) a qualified governmental excess benefit arrangement described in section 415(m).

**(3) Definitions.**—For purposes of this subsection—

(A) Plan includes arrangements, etc.—The term "plan" includes any agreement or arrangement.

(B) Substantial risk of forfeiture.—The rights of a person to compensation are subject to a substantial risk of forfeiture if such person's rights to such compensation are conditioned upon the future performance of substantial services by an individual.

**(g) Governmental plans must maintain set-asides for exclusive benefit of participants.**—

**(1) In general.**—A plan maintained by an eligible employer described in subsection (e)(1)(A) shall not be treated as an eligible deferred compensation plan unless all assets and income of the plan described in subsection (b)(6) are held in trust for the exclusive benefit of participants and their beneficiaries.

**(2) Taxability of trusts and participants.**—For purposes of this title—

**(A)** a trust described in paragraph (1) shall be treated as an organization exempt from taxation under section 501(a), and

**(B)** notwithstanding any other provision of this title, amounts in the trust shall be includible in the gross income of participants and beneficiaries only to the extent, and at the time, provided in this section.

**(3) Custodial accounts and contracts.**—For purposes of this subsection, custodial accounts and contracts described in section 401(f) shall be treated as trusts under rules similar to the rules under section 401(f).

3. 26 U.S.C. § 457(g)(1). This trust requirement does not apply to tax exempt organizations that are not governmental units. (The Trust Agreement in this case has not been presented to the Court. The Court assumes it to be fully consistent with the statute and the Plan.)

### THIS IS A "SELF–SETTLING" TRUST, NOT EXEMPT UNDER 11 U.S.C. § 541(c) or C.P.L.R. § 5205(c)

■ The Debtor argues that the funds are exempt under CPLR § 5205(c) (as made applicable in bankruptcy cases by N.Y. Debtor and Creditor Law § 282) because that provision states that "all property while held in trust for a judgment debtor, where the trust has been created by, or the fund so held in trust has proceeded from, a person other than the judgment debtor, is exempt from application to the satisfaction of a money judgment," and this trust (she argues) was "created by" the State of New York and the plan trustee, not by her.

■ This is clearly incorrect. Black's Law Dictionary quotes the Second Restatement of Trusts within its definition of "trust" as follows: "[A] trust involves three elements, namely, (1) a trustee, who holds the trust property and is subject to equitable duties to deal with it for the benefit of another; (2) a beneficiary, to whom the trustee owes equitable duties to deal with the trust property for this benefit; (3) *trust property, which is held by the trustee for the beneficiary.*" [Underline added.] Black's Law Dictionary 1513 (7th ed.1999). Though the state has taken care of the matter of obtaining a trustee and of setting forth the trustee's duties with regard to the trust property for the benefit of those who participate, no "trust" is created for this Debtor until she puts her property into the trust. Nothing could be more fundamental than this. Indeed, this has been codified, at least for purposes of the Estates, Powers and Trusts Law ("EPTL"): § 1–2.2 of the EPTL provides a definition of "creator" of a trust. "A creator is a person who makes a disposition of property." N.Y. Est. Powers & Trusts Law § 1–2.2 (McKinney 1998).

Though the definitions contained in the EPTL do not necessarily govern terms used in the CPLR or the Debtor and Creditor Law, the Debtor's proffered interpretation of the term "creator" can have no logical merit. Otherwise a wealthy debtor could place millions of dollars into any of thousands of investment trusts or business trusts that already pre-exist as operating arms of investment houses and the like, and claim that it is all exempt because, for example, it was Morgan Stanley Dean Witter Discover and Co. who "created" the "Common Sense Trust." (That investment trust, as of August 25, 1997 consisted of $5.7 billion dollars in mutual funds. See Dow Jones News Service, August 25, 1997.)

Lawyers, bankers, accountants, and other professionals may spend their working lives setting up investment vehicles in the form of trusts. But no trust is "created" for anyone's benefit until someone gives to that trust some property to administer for that individual's benefit. The trust that is part of this Debtor's estate was "created" when she placed some of her earned income into the trust.

This argument may be laid to rest by noting, finally, that the phraseology of CPLR 5202(c) has more than 150 years of "judicial gloss." The phrase "where the trust has been created by, or the funds so held in trust have proceeded from, a person other than the judgment debtor" has a well-settled meaning that is not obvious.

■ No matter who the actual settler is or was, the provision is well-understood to exempt only the judgment debtor's interest in income— not her interest in any remainder, or her power to invade. And that income interest is exempt (some courts have held) only to the extent reasonably necessary for her support. What this "exemption" actually protects is the ability of the "other" person (the settlor) to control the disposition of such "other" person's own property when, for whatever reason, that person does not choose to "gift" it outright to the debtor or to manage it himself or herself for the debtor's benefit. However, it only protects the trust. It does not exempt the income when the debtor has a right to receive it,

or when the debtor has received it in fact. (See CPLR § 5205(d)(1) for the "income exemption.") And the statute would not exempt funds in a money market trust, for example, even if such funds "proceeded from" another person, because the debtor is free to invade them.

In sum, CPLR 5205(c)(1) is not as generous an exemption as its cryptic language might suggest.[4]

4. In compiling the following citations, no effort is made to determine whether statements were "good law" at the time they were made, or whether they are "good law" today. This is because no effort has been made to locate the complete New York statutes as they existed at the time these statements were made. The purpose of this compilation is to support the proposition that there is, in fact, more than 150 years of "gloss" on this statutory exemption for trusts, and that that gloss stands for the proposition that the exemption has not been viewed to be as broad as the language of the statute might seem.

In *Craig v. Hone*, 2 Edw.Ch. 554, 1835 WL 2422, the Chancery Court of New York, in 1835, stated that its own jurisdictional statutes vested it with power " 'to compel the discovery of any property, money or thing in action belonging to [a judgment debtor], and of any property, money or thing in action due to him or held in trust for him, and to decree satisfaction out of what might be discovered, whether the same were originally liable to be taken in execution at law or not,' " but that an exception was enacted " 'where such trust has been created by, or the fund so held in trust has proceeded from, some person other than the defendant himself.' " *Id.* at *12. Addressing the effect of that exception, the Chancery Court stated that "[t]he object was to prevent express trusts proceeding solely from the bounty of a parent or of some third person, and valid in their creation under the statute, from being overthrown or diverted from their object by [creditors]. It was enough to say that all, beyond necessary support, where the trust is not for accumulation, should be liable to the creditors of the *cestui que* trust. Such surplus may be reached by a bill in equity, but the trust itself cannot be disturbed.... [T]he exception in the statute ... must be understood with reference to this state of things.... [T]he exception ... probably was intended to protect property the subject of an express trust created by a parent or relative in behalf or for the support of an unfortunate child or relation, and which property had been placed in the hands of a trustee for the purpose of putting it beyond the reach of the *cestui que* trust or creditors.... It follows, then, from this view of the subject, that notwithstanding the language of the exception or saving clause of the statute, the surplus income of a trust estate, valid in its creation, and beyond what is necessary for the education and support of the *cestui que* trust, may be applied, by the decree of this court, to the payment of debts contracted by him; and that property, money or things in action, held in trust for a debtor, if not such a trust as the law has expressly authorized, is equally liable to be so applied." *Id.* at *12–13.

One year later, in the case of *Hawley and King v. James*, 16 Wend. 61, 1836 WL 2808 (N.Y.), one of the reviewing adjudicators on the Court for the Correction of Errors of New York observed the Chancery Court "is authorized to decree satisfaction of [a money judgment] 'out of any property or thing in action held in trust for the defendant,' 'except where such trust has been created by, or the fund so held in trust has proceeded from some other person than the defendant himself.' ... [A] principal would be fraught with injustice, which would permit an individual to enjoin millions which he could dispose of at his pleasure, and on the strength of that power of disposition, obtain credit, and yet, when a creditor came to invoke the aid of the law to reach this apparent pledge, would deny him all assistance. On the contrary, it is believed to be a universal principle, running through the whole system of written and unwritten law, that any interest or property, which a debtor may himself dispose of, the law can reach and dispose of in his behalf, for the satisfaction of his debts." *Id.* at *94.

In *Graff v. Bonnett*, 31 N.Y. 9, 1865 WL 3889 (N.Y.), the Court of Appeals, used the very same language. It stated "[o]ne theory is, that this provision was designed to protect the interest of a beneficiary in a trust, whose object it was to provide for his maintenance and support, and to the extent necessary for such purpose only. Another theory is, that the exception exempts from the jurisdiction of a court of equity in this respect, all trusts, of whatever description, which proceed from, or are created by some person other than the debtor himself. A third theory is, that the exception applies to property held in trust for the debtor, not belonging to or coming from him, but proceeding from a third person, though created for the debtor's benefit, and in all such cases preserves the trust fund intact." *Id.* at *3. The majority view was that "the true reading of the statute is this: That as a general proposition, property held in trust for the debtor, and for his benefit, may be reached through the agency of a court of equity, and applied to the satisfaction of his debts, but not

To recapitulate, this is a self-settling trust. And the Court rejects the argu-

property held in trust for him upon a trust, or arising out of a fund proceeding from a third person; which last named trust property is to be exempted from equity jurisdiction, not wholly or absolutely, but to the same extent, and under the same conditions under which trust property may be enjoyed by the debtor, secure from the attack of his creditors, under other and general provisions applicable to trust property. In other words, it was a legislative declaration, in language intended to be explicit, but possibly liable to some misconstruction, that property held in trust for the debtor, when such trust proceeded from himself, was in no case to be protected for his benefit; but where the trust or the fund proceeded from some other source, the liability of the property to, or its exemption from judicial seizure, was to depend upon the general provisions of law applicable to trust property. It was not the intention of the legislature to exempt every species of trust property originated by a third person from liability for the debts of the beneficiary, nor to declare in this connection the condition and circumstances upon which such liability was to depend, but to qualify the comprehensive language employed in a previous part of the section and to partially limit its otherwise apparently universal application." *Id.* at *3–4.

A separate opinion in that case stated this: "[W]here a trust has been created by some other person than the defendant, or funds held in trust had proceeded from some other person than the defendant, satisfaction of the creditor's judgment is not to be decreed out of such trust funds. In other words, the trust is not to be subverted or destroyed, and the property or money so placed in trust is not to be taken by the creditor where it has proceeded from another party. If a debtor will make a conveyance of his own money or lands in trust for himself, the property so put in trust, or, in the words of the statute, so held in trust for him, is to be applied to the payment of his debts; but if a relative or other person will create a trust for his benefit, though the trust is in a legal as well as a popular sense held in trust for him, as it was not his property before being embraced in the trust, it is not to be disturbed. It was to guard against a possible construction of the general words which would allow the trust fund itself to be taken, that the exceptions were introduced by the legislature. There is not one word said respecting the income of the trust funds." *Id.* at *11. This appears, however, to have been the dissenting view.

In 1877, the Court of Appeals had stated, in *Williams v. Thorn*, 70 N.Y. 270, 1877 WL 12038 (1877), that the provisions of the stat-

utes exempting trust funds when the trust has been created, or the trust fund has proceeded from some person other than the defendant, "do not exempt absolutely the whole income; they were intended to exempt the principal fund, and the beneficial interest of the *cestui que* trust in the income only to the extent of a fair support out of the trust estate."

In *Schenck v. Barnes*, 156 N.Y. 316, 50 N.E. 967 (1898) the highest court of the state looked at the language "except where such trust has been created by, or the fund so held in trust has proceeded from, some person other than the defendant himself," (citation omitted) and stated "[i]t was at first contended that this statute protected absolutely the interest of a debtor in a trust created for his benefit by a third party, but it is now the settled law ... that the surplus income of a trust estate shall be liable in equity to the claim of the creditors...." *Id.* at 320, 50 N.E. 967.

Clearly, an expectancy in a trust, other than income, can be obtained by creditors. In *Bergmann v. Lord*, 51 Misc. 213, 100 N.Y.S. 990 (1905) it was stated that the words "in trust for a judgment debtor" (citation omitted) are "restricted to the interest of a beneficiary of income, inalienable under the Personal Property Law ... and likewise inalienable before that enactment, through judicial extension of the statutes relating to trusts of realty.... [n]o limitation has been placed by the statute upon the right to alienate expectant estates in personalty, a right which always existed at common law ... and it is contrary to the policy of the law to exclude a judgment creditor from the benefit of any property interest which the debtor could dispose of by assignment." *Id.* at 991.

By 1939, it was apparently recognized that if there was more in the trust than was necessary for the support of the debtor, a creditor could pursue that surplus. Thus, in the case of *In re Senior's Estate*, 171 Misc. 904, 14 N.Y.S.2d 121 (1939) there was discussion of what was then §§ 792 and 793 of the Civil Practice Act. That statute was quoted as stating that "[t]his article does not authorize the seizure of, or other interference with, ... any money, thing in action or other property held in trust for a judgment debtor, where the trust has been created by, or the fund so held in trust has proceeded from, a person other than the judgment debtor." (Citation omitted) But the Surrogate's Court said "[t]hat provision has had a fixed legal meaning from the days of the Revised Statutes. It recognizes 'the right of the creditor in a proper action to have the amount necessary for the support of the debtor ascertained, and to compel the application of the surplus.' " *Id.* at 123.

ment that the monies in it "proceeded from" the employer, rather than the Debtor. The funds "proceeded from" the Debtor herself (money fully earned by her labors, which she freely elected to defer). For these reasons, her argument that CPLR § 5205(c) or 11 U.S.C. § 541(c) protects this fund from her creditors is rejected.

## THE ANTI–ALIENATION PROVISION

██ As explained in *Lowe,* a contractual anti-alienation provision is, standing-alone, of no import whatsoever for exemption purposes. A debtor's own contract alone will not shelter that debtor's rights from seizure by her creditors. It takes a statute to do that, such as ERISA or CPLR § 5205(c). The anti-alienation provision in this Plan says:

### SECTION 12. GENERAL LIMITATIONS AND PROVISIONS

12.4 (a) Except insofar as may otherwise be required by law or in accordance with this Section 12.4, no amount payable at any time under the Plan shall be subject in any manner to alienation by anticipation, sale, transfer, assignment, bankruptcy, pledge, attachment, garnishment, charge or encumbrance of any kind, and any attempt to so alienate such amount, whether presently or thereafter payable, shall be void. If any person shall attempt to, or shall, so alienate any amount payable under the Plan, or any part thereof, or if by reason of bankruptcy or other event happening at any time such amount would not be enjoyed by the person to whom it is payable under the Plan, then the Trustee shall notify the Board and, if it so elects, may direct that such amount be withheld and that the same or any part thereof be paid to or for the benefit of such person, his or her spouse, children or other dependents, or any of them, in such manner and proportion as the Trustee may deem proper.

However, there is nothing to give it force of law as against this Debtor's creditors. It is nothing more than what was addressed in *Lowe* this way: "If you and I agree that I will sell you my car for $5000, payable 30 days after transfer of ownership, any contract agreement that 'my creditors may not reach my right to take the $5000' is a waste of ink and paper." *Lowe* at 625 n. 13.

## NOT ALL TRUSTS IN CONTEMPLA-TION OF RETIREMENT ARE EXEMPT

In arguing that this is an exempt retirement planning device, the Debtor makes much of the Plan's stated "Purpose" to give state employees "a convenient way to save on a regular and long-term basis and thereby provide for their retirement . . . ." But the argument lacks focus. To "save" for "retirement" has nothing at all to do with what is or is not exempt from creditors or a bankruptcy trustee. Bankruptcy attorneys tend to forget that the overwhelming majority of people never suffer judgment debts and never file a bankruptcy case. Saving for retirement is very wise. For people who hope and expect never to be insolvent, saving in an "exempt" way is of less concern than saving in a way that optimizes security, yield and liquidity. And even for those who are wary of the financial future, liquidity may be more important than exemptability, particularly when assessing unplanned (but not inconceivable) financial challenges—such as a sudden need to assist a parent or other family member. (Even bankruptcy judges may experience the "double hit" of paying an unplanned expense and paying a tax-penalty as well. But we consider ourselves fortunate to have a means to pay, penalty or not.)

██ There can be no doubt that not every trust or plan or account that is in contemplation of retirement is exempt.

Some statute is necessary. See *Lowe*, generally.

## RETIREMENT AND SOCIAL SECURITY LAW § 110[5]

■ As explained above, not every "retirement vehicle" is, or ought to be, exempt. For nearly all Americans, the ability to "save" now tax-free, and pay taxes later at a lower rate, is a fine retirement device. That fact has no more to do with "exemptions" than does putting one's "retirement savings" into a bank or investment portfolio.

Moreover, as stated in *Lowe:* "Debtor and Creditor Law § 282 contains . . . critical language. As to bankruptcies concerning a natural person domiciled in New York, such a debtor 'may exempt from the property of the estate . . . *only* (1) personal and real property exempt from application to satisfaction of money judgments.' " (Emphasis added). *Lowe* at 618. Debtor & Creditor Law § 282 uses the word "only," and seems, thus, to exclude consideration of the N.Y. Retirement and Social Security Law § 110 in bankruptcy cases.[6]

But even if the word "only" were not used, § 110 has not been amended to exempt deferred compensation. This Court may not act as a superlegislature and create an exemption for the Debtor. This is fully examined in *Lowe*.

## INSURANCE LAW § 4607 ADDRESSES ONLY A "RETIREMENT SYSTEM"

■ By its own terms, N.Y. Insurance Law § 4607 exempts only a "retirement system." The plan here is a "savings" plan, and, as explained above, that is not the same as a pension plan or "retirement system" even when the savings plan is an element of planning for retirement.

The Debtor's Insurance Law argument is rejected.

## CONCLUSION

All of the Debtor's arguments are rejected. The Debtor herself might be bound by contract not to seek to invade her funds at this time, but as explained in *Lowe*, the anti-alienation clause of the Plan is not enforceable as against her creditors, and the Trustee may, under 11 U.S.C. § 544 (as contrasted with 11 U.S.C. § 541), sue the Plan for turnover of her funds, if the Plan's "Board" does not elect to honor his demand therefor.[7]

It is

SO ORDERED.

---

5. N.Y. *Retirement and Social Security Law* § 110 provides:

§ 110. **Exemption from taxes and legal process**
The right of a person to a pension, a pension-providing-for-increased-take-home-pay, an annuity or a retirement allowance, to the return of *contributions*, the *pension*, the pension-providing-for-increased-take-home-pay, annuity, or retirement allowance itself, any optional benefit, including any benefit or monies accruing under an optional retirement program pursuant to article eight-B or one hundred twenty-five-A of the education law, any other right accrued or accruing to any person under the provisions of this chapter and the monies in the various funds continued under this chapter.
1. Are hereby exempt from any state or municipal tax, except the estate tax, and

2. Shall not be subject to execution, garnishment, attachment, or any other process whatsoever, and
3. Shall be unassignable, except as in this chapter specifically provided. (As amended L.1999, c. 291, § 2, eff. July 20, 1999.)

6. There can be no doubt, however, that a debtor need not rely on that statute to obtain an exemption for her pension as a state employee. N.Y. Debtor and Creditor Law § 282(2)(e) exempts all such pensions. See *In re Bentley*, 237 B.R. 10 (Bankr.W.D.N.Y. 1999), Bucki, J.

7. See the summary of Section 6 of the Plan in footnote 1. The Court awaits the Plan's view as to whether it must disgorge the funds, given the Debtor's choice to "liquidate" her "assets" in a voluntary Chapter 7 case.